**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF ILLINOIS *ex rel.* DANIEL FRAWLEY, and DANIEL FRAWLEY, and MAUREEN FRAWLEY )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANTHONY MCMAHON, ESTATE OF FRANK MCMAHON, JOHN MCMAHON, NANCY MCMAHON, KATHLEEN MCMAHON, BRIDGET MCMAHON, SUSAN THIES, CHRISTINE STAJSCZAK, MARY CATHERINE HRASCINSKI, DANIEL HEBERT, MCMAHON FOOD CORPORATION, MCMAHON DAIRY PRODUCTS, INC., C&M JV1 COMPANY, LTD., C & C DAIRY, INC. KRYSTAL DAIRY SERVICES, INC., WINDY CITY ELECTRIC CO., WINDY CITY ELECTRIC AVIATION CORPORATION, ACE MECHANICAL CORPORATION, PLUMBING SYSTEMS, INC., QUANTUM CROSSINGS, LLC, AMPERE ELECTRIC, CO., ARAMARK CORRECTIONAL SERVICES, LLC, and ARAMARK CORPORATION, )<br><br>Defendants. ) | Case No. 11-cv-4620<br><br>Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs-Relators bring this *qui tam* action under the False Claims Act ("FCA"), 31

U.S.C. § 3730, and the Illinois False Claims Act ("IFCA"), ILCS 175. Specifically, Relators

allege false claims in violation of 31 U.S.C. § 3729(a)(1) and ILCS 175/3(a)(1) (Counts I and IV,

respectively); false statements in violation of 31 U.S.C. § 3729(a)(1)(B) and ILCS 175/3(a)(2)

(Counts II and V, respectively); conspiracy to violate the FCA and IFCA in violation of 31

U.S.C. § 3729(a)(1)(C) and ILCS 175/3(a)(3) (Counts III and VI, respectively). Currently before the Court are the following motions to dismiss Relators' Second Amended Complaint [92]: Defendants' joint motion to dismiss [142] pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b), and invoking the statute of limitations; Defendants Aramark Correctional Services, LLC and Aramark Corporation's motion to dismiss [145] based on Rules 12(b)(1) and 12(b)(6) and the statute of limitations; and Defendant Ampere Electric Co.'s motion to dismiss [153] pursuant to Rules 12(b)(6), 8(a), and 9(b). For the reasons set forth below, Defendants' joint motion to dismiss [142] is granted pursuant to 12(b)(1) and the case is dismissed as to all Defendants, including those that did not join the joint motion to dismiss [142], pursuant to Rule 12(h)(3). The Court dismisses the case for lack of jurisdiction because Relators' allegations of wrongdoing were publicly disclosed at the time the action was filed, and Relators do not qualify as an original source because they did not "voluntarily" disclose the information to the government. Defendants Aramark Correctional Services, LLC and Aramark Corporation's motion to dismiss [145] and Defendant Ampere Electric Co.'s motion to dismiss [153] are denied as moot. The Court declines to exercise supplemental jurisdiction over the state claims brought under Illinois law. Accordingly, the case is dismissed in its entirety, the Court will enter a final judgment, and the case will be closed.

## I.  Background

On July 8, 2011, Relators Daniel and Maureen Frawley filed a complaint under seal, alleging various violations of the False Claims Act ("FCA") and the Illinois False Claims Act ("IFCA"). The United States of America and the State of Illinois declined to intervene in the action on November 25, 2013. The Court subsequently unsealed Relators' initial complaint, and on February 27, 2014, Relators filed an amended complaint with leave of the Court. On January

15, 2015, the Court granted Defendants' motion to dismiss Relators' First Amended Complaint. *U.S. and State of Illinois ex rel. Frawley v. McMahon*, 2015 WL 115763, (N.D. Ill. Jan. 5, 2015). Relators filed a Second Amended Complaint ("SAC") with leave of the Court on May 4, 2015, which is the operative complaint for purposes of this opinion.

The alleged scheme relates to the City of Chicago's Minority and Women Owned Business Enterprise Procurement Program, which aims to enhance opportunities for minority and women-owned business enterprises ("MBEs" and "WBEs," respectively) to compete for government contracts. [92, at ¶¶ 37–39.] According to the SAC, a business must be certified by the City as an MBE or WBE to participate in the program. To receive certification, a business must meet three criteria. First, at least fifty-one percent of the company must be owned and controlled by at least one minority or woman. Second, management and daily operations must be controlled by at least one minority or woman. Third, the company must be a viable, independent business, and the minority or woman principal must have the resources and expertise necessary to operate the business without substantial reliance on non-MBE or non-WBE businesses. [92, at ¶ 42.] Approved certifications are valid for a period of five years, after which they must be renewed in order to continue working with the City as an MBE/WBE. [92, at ¶ 43.] The SAC alleges that the City's goal is to award at least twenty-five percent of the annual dollar value of all City contracts to MBEs and at least five percent to WBEs. [92, at ¶ 44.] The SAC alleges that the City can obtain its MBE/WBE contracting goals by either:

a.      Contracting directly with MBE/WBE certified companies through the "target market" program, which designates certain contracts for competition limited exclusively to MBE/WBE companies; or
b.      Including a requirement in all City contracts of a value in excess of $10,000 that the contractor awarded that contract commit to the expenditure of at least the MBE/WBE percentages of the dollar value of the contract with MBE/WBE firms.

[SAC at ¶ 45.]

Relators allege that Defendants submitted false certifications to fraudulently obtain MBE and WBE status and secure municipal contracts, at least some of which were funded by the federal government;[1] submitted false invoices to various municipal agencies; conspired to submit rigged bids for various contracts to restrict open competition and to fix the price of milk sold to municipal agencies at artificially high levels; and falsely represented to the City that Defendant McMahon Dairy Products maintained nonsegregated work facilities.

## A.    False Certifications

### 1.    McMahon Food Corporation and McMahon Dairy Products, Inc.

The SAC alleges that the "McMahon Family Business Enterprise" began in 1987 with the incorporation of Defendant McMahon Dairy Products, Inc.  Although Frank McMahon was the owner, operator, and chief decision-maker of the company, he began listing his mother, Catherine McMahon, as the president and principal owner of Defendant McMahon Dairy Products, Inc. in 1990 to fraudulently obtain WBE certification.  [92, at ¶ 47.]  In 1991, Frank incorporated a second company, Defendant McMahon Food Corporation, again listing Catherine as the president and principal owner despite the fact that she had no involvement in any aspect of the company.  [92, at ¶ 49.]  When Catherine became ill, Frank replaced her with his daughter, Defendant Bridget McMahon, now Bridget McMahon Healy, who was a teenager at the time. [92, at ¶ 50.]  Relators allege upon information and belief that Bridget is still listed as the president and principal owner of both companies, even though she was never involved in the management, operations, decision-making or any other aspect of either business; rather, Frank

---

[1] Relators allege that Defendants  fraudulently obtained millions of dollars' worth of municipal contracts with multiple public entities, including the City of Chicago, John H. Stroger Jr. Hospital of Cook County, Juvenile Temporary Detention Center of Cook County, Cook County Bureau of Health Services, Chicago Board of Education, Chicago Public Schools, and the Chicago Housing Authority.

continued to run the business until his death. By using these allegedly false certifications as WBEs, McMahon Dairy and McMahon Food were awarded various food distribution contracts and subcontracts by the City, primarily by the Board of Education of the City of Chicago. [92, ¶ 52.]

In support of these allegations, the SAC alleges details regarding twenty-three contracts between McMahon Food and the John H. Stroger Jr. Hospital of Cook County, the Juvenile Temporary Detention Center of Cook County, and the Cook County Bureau of Health Services; specifically, it sets out the date awarded, the contract number, the services provided and the contract value of each contract. [92, at ¶ 170.] The total value of these contracts, which are allegedly only a sample of a larger pool of fraudulently-obtained contracts, is $4,463,802.65. [92, at ¶ 171.]

### 2. Windy City Electric Co., Windy City Electric Aviation Corporation, and Ace Mechanical Co.

Frank's brothers, Anthony and John McMahon, allegedly expanded the McMahon Family Business Enterprise by incorporating Defendant Windy City Electric Co. in 1989. [92, at ¶ 53.] To receive WBE certification, the brothers listed their wives as the officers and owners. Specifically, they listed Defendant Nancy McMahon as president and Defendant Kathleen McMahon as secretary, and designated Nancy and Kathleen as 50 percent co-owners. Neither woman has ever been involved in the management, operations, or decision-making of Windy City Electric, although Kathleen did assist in everyday business around the office. [92, at ¶¶ 54–55.] Defendant Windy City Electric allegedly won various contracts and subcontracts with the City, the Chicago Housing Authority, and the Board of Education based on its false certification as a WBE.

In 2006, the McMahons also incorporated Defendant Windy City Electric Aviation Corporation. In the corporate records, they again listed Nancy as president, Kathleen as secretary, and each woman as a 50 percent co-owner, subsequently obtaining fraudulent WBE certification.

The SAC alleges that Anthony and John expanded the McMahon Family Business Enterprise in 1993 by incorporating Defendant Ace Mechanical Co., using Jimmy Acevado as a Hispanic front person to fraudulently obtain MBE status. [92, at ¶ 60.] Acevado never participated in ownership, management, operations or decision-making; rather, John and Anthony oversaw and managed the company, and Defendant Daniel Hebert also managed the day-to-day operations of the company, including preparing and submitting invoices to the government. [92, at ¶¶ 61, 65.] Based on its false MBE certification, Defendant Ace Mechanical Co. fraudulently obtained contracts and subcontracts from the City, the Chicago Housing Authority, and the Board of Education for plumbing services during the time period between its incorporation in 1993 and its involuntary dissolution in 2008. [92, at ¶ 62.]

Based on their allegedly false WBE and MBE statuses, Windy City Electric and Ace Mechanical won more than seven City contracts between 2003 and 2010, as well as an additional seven contracts with the Board of Education specifically between 2005 and 2011. [92, at ¶¶ 173, 177.] The SAC details the date awarded, the contract number, the services provided, and the contract value for each of these contracts, alleging a total value of $25,360,822.68 for the seven City contracts and $17,091,142.00 for the seven Board of Education contracts. [92, at ¶ 174, 178.]

Anthony became the point person for preparing and submitting all paperwork to the City, Chicago Housing Authority, and Board of Education for false MBE and WBE certification. [92,

at ¶ 66.]  Bridget, Nancy, Kathleen, and Acevado each signed the disclosures, affidavits and other paperwork prepared by Anthony, knowing that they were not actually involved in the ownership, management, and operations of their respective companies.  [92, at ¶ 67.]  Relators allege that Defendant Susan Thies notarized the majority of paperwork prepared by Anthony, despite knowing that Bridget, Nancy, Kathleen, and Acevado were not involved in the ownership, management, and operation of the entities.  [92, at ¶ 68.]

### 3. Quantum Crossings, LLC and Ampere Electric Co.

Since at least 2007, Windy City Electric has allegedly partnered with Quantum Crossings, LLC, a certified MBE.  Relators do not allege that Quantum Crossings is a phony MBE.  The SAC alleges that Windy City Electric and Quantum Crossings would list each other as direct or subcontract parties to government contracts in order to meet government WBE and MBE requirements and that Quantum Crossings knew that Windy City Electric was a phony WBE.  [92, at ¶ 76.]

Relators vaguely allege that "Ampere Electric was another fraudulent MBE that the McMahons used as a front to obtain City contracts," and that the McMahons "were the real decision makers behind any contract that they were involved in that relate to Ampere."  [92, at ¶ 76.]  Relators do not provide any additional details relating to Ampere.

### 4. C&M JV1 Company, Ltd.

In 2003, the McMahons expanded the family businesses by incorporating Defendant C&M JV1 Company, Ltd.  [92, at ¶ 70.]  Corporate records list Defendant Christine Stajsczak as president and Bridget McMahon as secretary of C&M.  Relators allege, on information and belief, that C&M is a joint venture of Defendants McMahon Food, McMahon Dairy, C & C Dairy, and Krystal Dairy.  Defendant Christine Stajsczak is listed as president, secretary, and

principal owner of C & C Dairy, and Defendant Mary Catherine Hrascinski is listed as president, secretary, and principal owner of Krystal Dairy.

C&M allegedly won dairy contracts with the City and Board of Education by falsely representing that two or more WBEs would serve as its vendors: McMahon Food, McMahon Dairy, C & C Dairy, and/or Krystal Dairy. The SAC further alleges that when the Board of Education awarded C&M contracts, it waived its MBE sub-contracting requirements in reliance on C&M's representation that at least two of its vendors would be WBEs, finding that C&M had made "good faith efforts" at compliance. [92, at ¶¶ 71, 141, Exhibit 4.] Relators allege that "C&M would not have gotten the contracts to supply the Chicago Public Schools with milk if it had not certified that it was a significant WBE." [92, at ¶ 71.] The SAC alleges that based on these false representations regarding WBE status, the Board of Education awarded nine contracts to C&M, McMahon Food, McMahon Dairy, C & C Dairy, and/or Krystal Dairy to supply milk to the Chicago Public Schools ("CPS") between 2005 and 2013. [92, at ¶ 143.] The SAC again provides the date, number, value, and services associated with each contract and alleges that the total value of these contracts is $156,009,645.05. [92, at ¶¶ 143–44.]

### 5. Plumbing Systems, Inc.

In 2005, the McMahons incorporated Defendant Plumbing Systems, Inc., listing John as president, Anthony as secretary, and both brothers as 50 percent co-owners. The two brothers allegedly used false MBE suppliers, such as "Jose Supply," to meet the government's MBE's requirements. [92, ¶ 174.] "Jose Supply" did not supply any plumbing tools or materials for government contracts and allegedly operated out of a telephone booth. The McMahons provided plumbing services and materials through Plumbing Systems and under the guise of "Jose Supply." From approximately 2005 to the present, Plumbing Systems has worked directly and

indirectly on government contracts with the Chicago Housing Authority, the City of Chicago, and the Board of Education. The brothers allegedly pay front minorities, such as "Jose," a percentage of the amount billed for supplies. [92, ¶ 174.]

### 6. Nexus with Federal Funds

Relators make six allegations connecting these contracts with federal funds. Specifically, the SAC alleges that: (1) the federal government heavily subsidized the Chicago Public Schools' breakfast and lunch program [92, at ¶¶ 145–51]; (2) Defendants filled out sections of bid applications titled, "Certification of Federally Funded Matters" [92, at ¶¶ 152–54]; (3) the Cook County Jail receives federal funds to reimburse the county for the cost of holding immigration detainees [92, at ¶ 157]; (4) Defendant Quantum Crossings was awarded federally funded contracts as evidenced by a Freedom of Information Act response from the Chicago Department of Aviation [92, at ¶ 159]; (5) on information and belief, the Chicago Board of Education receives federal funds [92, at ¶ 179]; and (6) the Chicago Housing Authority receives funds from the federal government to redevelop and modernize public housing units [92, at ¶ 182.]

### B. False Invoices

In addition to alleging false certification, Relators allege that the McMahons submitted false invoices to the City, the Board of Education and the Chicago Housing Authority. Specifically, they allege that the McMahons submitted false invoices the government for unused materials and unperformed work. [92, at ¶ 189.] Further, the McMahons allegedly billed at rates higher than the contract rates and created a "ghost payroll" scheme for nonexistent employees. [92, at ¶ 6.] More specifically, they billed out John McMahon at the higher City journeyman plumber's rate although he is not a plumber and "otherwise padded the Government's bills."

[92, at ¶ 189.] The McMahons allegedly submitted these false invoices with the assistance of Defendant Daniel Hebert. [92, at ¶ 189.]

### C. Bid Rigging and Price Fixing

Relators further allege that the McMahons conspired to submit rigged bids for various contracts to restrict open competition and to fix the price of milk sold to municipal agencies at artificially high levels. In 1994, Frank McMahon allegedly told Relator Daniel Frawley that "he had his guys at [Chicago Public Schools] and that he charged artificially high prices for the milk delivered to CPS and charged for milk not delivered." [92, at ¶ 79.]

Relators allege that McMahon Food Corporation, and specifically Frank McMahon, conspired with Defendant Aramark Correctional Services, LLC, a division of Defendant Aramark Corporation (collectively "Aramark") to "submit rigged bids on many different Government contracts and wrongfully create an unlawful agreement between direct competitors that harmed the Government." [92, at ¶ 6.] Aramark allegedly used a minority front owner, who Aramark replaced around 2005 with an African American man named Harold Davis, who owned a company called Amer-I-Can Enterprises II, Inc. [92, at ¶¶ 121–23.] Aramark allegedly ran funds through Davis's business, without giving Davis any input. Davis was awarded the Cook County Jail commissary contract "for roughly the years of 2006–2008." [92, at ¶ 127.] The SAC alleges that Aramark executive Michael Maltese told Davis that "Frank [McMahon] tells us what we are going to charge [the Government] for milk every year" and that "Aramark does what Frank says." [92, at ¶¶ 129–30.] Maltese later informed Davis that Aramark had no intention of having Davis actually run the business and do the work for the commissary contract and that Aramark just wanted to run funds through Davis's company.

The SAC also alleges that Frank McMahon and McMahon Foods entered into a conspiracy with Aramark "with regard to a direct, horizontal market allocation between direct competitors" and that Aramark acquired the CPS milk contract after the Board of Education determined that it was no longer going to do business with McMahon Food and C&M. [92, at ¶ 156.]

### D. Segregated Work Facility

Relators allege that Defendant McMahon Food maintained segregated work facilities and falsely certified to the City with each contract and with each request for payment on the contracts that it maintained nonsegregated work facilities. The SAC details the McMahons' alleged poor treatment of minorities. [92, at ¶¶ 109–15.]

### E. Sources of Information

Relators allege that their knowledge of the fraud comes from the fact that they are first cousins to the McMahons and from their cooperation with an FBI investigation into the McMahons. [92, at ¶¶ 77, 85.] They allege that at various family events, Frank, John, and Anthony would brag about the money they made from their fraudulent WBEs and MBEs. [92, at ¶¶ 78–83.] In 2006, Relators assisted the FBI in an investigation of the McMahons and Daniel Hebert. [92, at ¶¶ 85–108.]

## II. Legal Standard

A Rule 12(b)(1) motion seeks dismissal of an action for lack of subject matter jurisdiction. The party asserting jurisdiction bears the burden of establishing that jurisdiction is satisfied. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). When reviewing a motion to dismiss under Rule 12(b)(1) where a party raises a factual challenge to jurisdiction, the Court may "properly look beyond the jurisdictional allegations of the complaint

and view whatever evidence has been submitted on the issue." *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 (7th Cir. 2013) (internal citation and quotation marks omitted). If the Court determines at any time that it lacks subject matter jurisdiction, it must dismiss the action as to all defendants. See Rule 12(h)(3); *Ricketts v. Midwest Nat. Bank*, 874 F.2d 1177, 1181 (7th Cir. 1989) (a district court has the authority to *sua sponte* review its subject matter jurisdiction).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (alteration in original). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable

inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Additionally, claims brought under the FCA are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 2016 WL 4555648, at *2 (7th Cir. Sept. 1, 2016). Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The heightened pleading standard serves three main purposes: "(1) protecting a defendant's reputation from harm; (2) minimizing strike suits and fishing expeditions; and (3) providing notice of the claim to the adverse party." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (citation and internal quotation marks omitted). "A plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Presser*, 2016 WL 4555648, at *4 (quoting *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). Although the precise details that must be included in a complaint may vary on the facts of a given case, plaintiffs must use some means of injecting precision and some measure of substantiation into their allegations of fraud. *Presser*, 2016 WL 4555648, at *4 (citations and internal quotation marks omitted). Further, "a plaintiff generally cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442–43 (7th Cir. 2011) (citation omitted). Pleading fraud on information and belief is only permissible when "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* at 443 (citation and internal quotation marks omitted). The provided grounds

"must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Id.*

## III.     Analysis

The FCA and the IFCA impose liability on any person who makes false or fraudulent claims for payment from the government.  31 U.S.C. § 3729(a)(1)(A-C); 740 Ill. Comp. Stat. 175/3(a)(1)(A-C).  The FCA's *qui tam* provision permits a private party, known as a "relator," to bring a civil action alleging fraud against the government on his own behalf, as well as on behalf of the United States.  See § 3730(b)(1).  If the claim is proven, the relator receives a percentage of the recovery.  § 3730(d).

Defendants make three main arguments for dismissal.  First, they argue that the case should be dismissed under Rule 12(b)(1) for lack of jurisdiction under the public disclosure bar of the FCA.  Second, they contend that the case should be dismissed under Rule 12(b)(6) because Relators fail to meet the heightened pleading standard of Rule 9(b).  Third, Defendants argue that many of the claims are time-barred.

Defendants' first argument is dispositive.  Because Relators' SAC is based on publicly disclosed information and Relators are not an original source of the information, the Court must dismiss the SAC for lack of jurisdiction under the public disclosure bar of the FCA.  See § 3730(e)(4).  Further, even if this jurisdictional hurdle did not apply, the Court would dismiss most of the claims under Rules 12(b)(6) and 9(b) because the SAC fails to sufficiently plead with particularity a connection to federal funds as to most of the Defendants.

### A.     Section 3730(e)(4) Public Disclosure Bar

Defendants argue that the public disclosure bar applies here because the SAC is based upon publicly disclosed allegations of fraud and Relators do not qualify as an original source

since their disclosure of the information to the government was not voluntary.  The Court agrees.

In its initial form, the FCA did not limit the sources from which a relator could acquire the information to bring a *qui tam* action.  *Cause of Action v. Chicago Transit Authority*, 815 F.3d 267, 272 7th Cir. 2016) (citation and internal quotation marks omitted).  However, the proliferation of New Deal and World War II government contracts led to an increase in fraud and "parasitic" *qui tam* lawsuits.  *Id.*  Individuals who played no part in uncovering a fraud brought opportunistic *qui tam* suits based on information that was the product of the government's own investigation.  *Id.*  In response, Congress amended the FCA several times, and the statute now contains a public disclosure bar that precludes *qui tam* actions based on information and allegations of fraud that have been publicly disclosed, unless the relator is an original source of the information.  See § 3730(e)(4).

There are two versions of the public disclosure bar at play in this case.  The 1986 version of the public disclosure bar states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

§ 3730(e)(4)(A) (1986).  In 2010, § 3730(e)(4)(A) was amended to read:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

The 2010 amendments to § 3730(e)(4)(A) are not retroactive, and therefore the applicable version of the subsection is the one that was "in force when the events underlying the suit took place." *Cause of Action*, 815 F.3d at 273 n.6 (citation and internal quotation marks omitted). Here, the SAC alleges fraud during time periods both before and after the 2010 amendments. However, under the facts of this case, the analysis is the same under either version of the public disclosure bar. Thus, the Court will not distinguish between the two different versions of the statute.[2]

The 2010 amendments also changed the definition of "original source," but this "is a clarifying rather than a substantive amendment" and thus applies retroactively. *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 369 (7th Cir. 2016). "Original source" is defined in the 2010 version of the public disclosure bar as an individual who either prior to disclosure under subsection (e)(4)(A) has "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." § 3730(e)(4)(B).

The Court conducts a three-step inquiry to determine whether the public disclosure bar applies. The Court must determine: (1) whether the relator's allegations have been "publicly

---

[2] Until 2010, the FCA expressly stated that the public disclosure bar is jurisdictional, and the Supreme Court confirmed as much in *Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 468 (2007). However, in the 2010 amendments, Congress replaced the statement "no court shall have jurisdiction" with "the court shall dismiss an action or claim under this section." In *Cause of Action*, 815 F.3d at 271 n.5, the Seventh Circuit left open whether the new language of § 3730(e)(4) is jurisdictional or substantive, while noting that other circuits that have addressed this issue have concluded that the amended language is not jurisdictional. The Seventh Circuit has since described the public disclosure bar as jurisdictional in dicta, citing *Rockwell* and not discussing the 2010 amendments to the statutory language. See *United States ex rel. Sheet Metal Workers Int'l Assoc., Local Union 20 v. Horning Invs., LLC.*, __ F.3d __, 2016 WL 3632616, *3 (7th Cir. July 7, 2016). Thus, until the Seventh Circuit holds otherwise, the Court will continue to treat the public disclosure bar as jurisdictional.

disclosed," (2) whether the complaint is "based upon" those publicly disclosed allegations, and (3) whether the relator is an "original source" of the information in the complaint. *Glaser*, 570 F.3d at 913. At each stage of the analysis, the relator bears the burden of proof. *Id.*

### 1. Public Disclosure

The allegations in a complaint are publicly disclosed "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Cause of Action*, 815 F.3d at 274 (quoting *United States ex rel. Feingold v. AdminaStar Fed., Inc.,* 324 F.3d 492, 495 (7th Cir. 2003)) (internal quotation marks omitted). Material is in the public domain when the information is open or manifest to the public at large, but also where the "facts disclosing the fraud itself are in the government's possession." *Cause of Action*, 815 F.3d at 274 (citation and internal quotation marks omitted). This is because the point of public disclosure of a false claim against the government is "to bring it to the attention of the authorities." *United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999), overruled on other grounds by *Glaser*, 570 F.3d at 907. Thus, "[d]isclosure of information to a competent public official … [is a] public disclosure within the meaning of § 3730(e)(4)(A) when the disclosure is made to one who has managerial responsibility for the very claims being made." *Cause of Action*, 815 F.3d at 274–75 (quoting *Bank of Farmington*, 166 F.3d at 861) (alterations in original).

Here, the allegations contained in the SAC were publicly disclosed in a federal investigation. Relator Daniel Frawley disclosed the information in the SAC to the federal government in 2006 after Mr. Frawley was arrested for bank fraud and given the option of either cooperating with the government in several investigations or being charged with bank fraud at that time. [146, Exhibit 1, at 13; Exhibit 2 at 20.] The FBI opened a full investigation and

briefed the United States Attorney's Office ("USAO") on the investigation.[3]  [146, Exhibit 4, at 1, 4.]  Relators state in their SAC that they assisted the FBI in the investigation, with Maureen Frawley assisting in undercover surveillance by wearing a wire to record conversations involving Defendant Daniel Hebert and Defendant Frank McMahon, and Mr. Frawley taking notes on the audiotapes.  [92, ¶¶ 85–87.]  According to the SAC, during the covertly recorded conversations, Defendants Frank McMahon and Daniel Hebert made incriminating statements concerning the alleged scheme set forth in the SAC.  [92, ¶¶ 85–87.]

Through Relators' disclosures to the FBI and USAO and the subsequent federal investigation, the fraud alleged in the SAC was publicly disclosed.  Disclosure to public officials of the FBI and USAO constitutes "public disclosure" since the officials are "authorized to act for or to represent the community on behalf of government."  *Bank of Farmington*, 166 F.3d at 861; see also *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 736 (7th Cir. 2007), overruled on other grounds by *Glaser*, 570 F.3d at 907, (holding that disclosures made to officials from the USAO and FBI constituted "public disclosures" for FCA purposes).  The U.S. Attorney is the primary legal representative of the United States within his or her respective district and would be the public official responsible for prosecuting fraud against the government, and the FBI is responsible for the investigation of fraud against the government. See *Fowler*, 496 F.3d at 736–37; *Cause of Action*, 815 F.3d at 274–75 ("Disclosure of information to a competent public official [is a public disclosure] when the disclosure is made to one who has managerial responsibility for the very claims being made." (citation and internal

---

[3] The USAO declined to prosecute any subjects of the federal investigation, and the FBI closed its investigative file, but the allegations in the SAC were then the subject of state and municipal investigations.  In May 2007, the FBI referred its investigation to the City of Chicago Office of Inspector General, which conducted an independent investigation into Relators' allegations of fraud.  In 2009, the Illinois Attorney General's Office conducted a criminal investigation of Relators' allegations of Defendants Ace Mechanical and Windy City Electric's fraud.  [146, Exhibits 14, 15.]

quotation marks omitted)).

Additionally, the allegations concerning Defendant Aramark's involvement with Harold Davis and his company Ameri-I-Can were disclosed in a civil lawsuit filed by Davis and Amer-I-Can in 2008 and in multiple news articles published prior to Relators filing this suit. For example, in 2007, The Chicago Sun-Times published an article detailing information that is substantially similar to information in the SAC, including Davis's claims of Aramark's alleged fraud. [See 146, Exhibit 17, Carol Marin, *An Upfront Businessman?*, Chicago Sun-Times (Apr. 4, 2007); Exhibit 18, China Strausberg, *Refuses to be Front Firm*, The Pittsburgh Courier (May 30, 2012); Exhibit 19, Chris Fusco *et al.*, *Businessman: Is Politics Stalling Fraud Probe?*, Chicago Sun-Times (May 11, 2012).] The public disclosure bar is triggered when the relator's claims were publicly disclosed in the news media. § 3730(e)(4)(A).

Relators criticize *Bank of Farmington* and argue that a disclosure to a competent public official should not constitute a "public disclosure." However, the Court cannot accept this argument. The Seventh Circuit has noted that other circuits have criticized its reading of "public disclosure" and believe that a public disclosure requires that there be some act of disclosure to the public outside of the government. *Cause of Action*, 815 F.3d at 276. Although the Seventh Circuit has indicated that "[t]here is significant force in the position of the other circuits," it did not overrule *Bank of Farmington. Id.* at 277. Thus the Court is bound by *Bank of Farmington*'s definition of "public disclosure," which includes disclosure of information to "a competent public official … when the disclosure is made to one who has managerial responsibility for the very claims being made." *Bank of Farmington*, 166 F.3d at 861. Next, Relators try to distinguish *Bank of Farmington* from the case at hand by arguing that *Bank of Farmington*'s definition of "public disclosure" only applies when a third party non-relator discloses the

information to the government.  However, Relators cite no authority supporting this proposition.

Thus, the Court concludes that the information in the SAC has been "publicly disclosed."

### 2.    "Based Upon" Publicly Disclosed Information

Defendants argue that the SAC is based upon the public disclosures discussed above, thus

satisfying the second prong of the FCA's public disclosure inquiry.  Relators did not respond to

this argument and have thus conceded this point.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466

(7th Cir. 2010) (noting that a "[f]ailure to respond to an argument * * * results in waiver" and a

party's "silence" in response to an argument leads to the conclusion that a point is conceded).

"[A] relator's FCA complaint is 'based upon' publicly disclosed allegations or

transactions when the allegations in the relator's complaint are *substantially similar to* publicly

disclosed allegations."  *Cause of Action*, 815 F.3d at 281 (quoting *Glaser*, 570 F.3d at 920).[4]

"[B]ased upon does not mean solely based upon, for a *qui tam* action even partly based upon

publicly disclosed allegations or transactions is nonetheless based upon such allegations or

transactions."  *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014)

(citing *Glaser*, 570 F.3d at 920).

The allegations in Relators' SAC are based on the information disclosed by Relators to

the government after Mr. Frawley's arrest for bank fraud and the information from the

subsequent government investigation.  The SAC even states that it is drawing on information

from Relators' cooperation with the FBI.  [92, ¶¶ 85–108.]  Thus, even if the allegations are not

---

[4] The 1986 pre-amendment version of the public disclosure bar stated that *qui tam* actions were precluded if they were "based upon the public disclosure of" the allegations.  See § 3730(e)(4)(A) (1986).  The Seventh Circuit interpreted "based upon" to mean "substantially similar to" the publicly disclosed allegations.  See *Glaser*, 507 F.3d at 920.  When Congress amended the statute in 2010, it "expressly incorporate[d]" the Seventh Circuit's interpretation.  *Leveski*, 719 F.3d at 828 n.1; see also § 3730(e)(4)(A) (2010) (requiring courts to dismiss *qui tam* actions where "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed").  Thus, our analysis is the same under either version of the statute.  *Cause of Action*, 815 F.3d at 281 n.20.

exactly the same as the information disclosed to the government and derived from the investigation, the SAC is based on the public disclosures for purposes of the FCA. See *Glaser*, 570 F.3d at 920–21 (holding that even though relator's complaint added a few allegations not covered in the publicly disclosed investigation, this was not enough to take the case outside the public disclosure bar).

### 3. Original Source

Because the allegations in the SAC are based upon information that was publicly disclosed, the Court must dismiss Relators' claims unless Relators are an "original source" of the information. § 3730(e)(4)(A); *Cause of Action*, 815 F.3d at 282. To establish that they are an original source, Relators must show that prior to a public disclosure, they "voluntarily disclosed to the Government" the information on which the allegations are based, or that they have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "voluntarily provided the information to the Government before filing [this] action[.]" § 3730(e)(4)(B); see also *Cause of Action*, 815 F.3d at 282–83. Here, relators have not shown that they are an original source because their disclosures to the government were not "voluntary."

Although the Seventh Circuit has not addressed the issue of whether disclosures to the government in response to a federal investigation into a relator's wrongdoings are "voluntary" for purposes of the FCA, other courts have taken the position that providing information to the government in this context does not qualify as "voluntary." See, *e.g.*, *U.S. ex rel. Repko v. Guthrie Clinic, P.C.*, 490 F. App'x 502, 504 (3d Cir. 2012); *U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 341 (3d Cir. 2005); *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995); *U.S. ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 744 (9th Cir. 1995); *City*

*of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*, 2016 WL 4203835, at \*15 (N.D. Ill. Aug. 8, 2016); *Prather v. AT & T Inc.*, 996 F. Supp. 2d 861, 869–70 (N.D. Cal. 2013); *U.S. ex rel. Stone v. AmWest Sav. Ass'n*, 999 F. Supp 852, 857–58 (N.D. Tex. 1997). The purpose of a *qui tam* statute is "to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time and to discourage person with relevant information from remaining silent. *Barth*, 44 F.3d at 704. "[O]ne who sits on information about fraudulent conduct for years and coughs it up only when the government comes knocking [is not disclosing such information voluntarily]. To hold otherwise would substantially undermine the efficacy of the incentives *qui tam* statues offer." *Rosenberg*, 2016 WL 4203835 at \*15.

In light of this objective underlying the *qui tam* provision of the FCA, the Eighth Circuit held in *United States ex rel. Barth v. Ridgedale Electric, Inc.* that because the relator had been aware of the fraud for some time, yet remained silent until a government investigator contacted the relator to request information, the relator did not disclose the information "voluntarily." 44 F.3d at 704. The Eighth Circuit noted that "rewarding [relator] for merely complying with the government's investigation is outside the intent of the [FCA]." *Id.* Similarly, the Third Circuit held in *United States ex rel. Paranich v. Sorgnard* that the relator did not provide information to the government "voluntarily" where the government identified the relator as having been involved in the fraud and initiated contact through a subpoena demanding information. 396 F.3d at 340–41. The Third Circuit reasoned that the relator's participation in the government's investigation was necessarily fueled by other forms of self-interest and that allowing the relator to extract the benefit of a *qui tam* action would undermine the voluntary provision requirement. *Id.* at 341.

Applying these principles to the case at hand, Relators purportedly had knowledge of Defendants' alleged fraud since approximately 1991, [92, ¶ 78], yet did not come forward and volunteer this information to the government until March 2006, when Mr. Frawley was arrested for bank fraud. Although Ms. Frawley was not arrested, she cooperated to help her brother, Mr. Frawley. Relators cooperated with the government in hopes that Mr. Frawley would not be prosecuted for bank fraud and to help his chances of receiving a reduced sentence if he was prosecuted. Thus, Relators provided information to the government in exchange for valuable consideration. See *Fine*, 72 F.3d at 744 (holding that relator was not an original source and did not offer information voluntarily because he acted in exchange for valuable consideration). Further, there are no indications that Relators would have come forward with this information absent the government's investigation of Mr. Frawley. See *Prather*, 996 F. Supp. 2d at 869–70 (holding that disclosure was not voluntary when relator claimed to have suspected fraud for at least five years but did not convey his suspicious to the federal government until he received a request from the FCC and noting that there was no indication that relator would have approached the government absent the FCC's request). Thus, given this context, Relators did not "voluntarily" disclose the information to the government and do not qualify as an "original source." See *Repko*, 490 F. App'x at 504 (holding that relator did not provide information voluntarily and thus was not an original source when he gave the government the information "only after he pleaded guilty to bank fraud, faced a substantial sentence, and bargained for a lower sentence"); *Stone*, 999 F. Supp at 857–58 (holding that relator's disclosures were not voluntary when they were made during the course of the government's investigation and in return for his statements, the government gave relator immunity from prosecution).

Relators argue that they made the disclosures voluntarily because the government had

asked Mr. Frawley to be an informant for *different* investigation—one concerning Tony Rezko—not for the investigation regarding the McMahons and the Defendants in this case. They contend that Mr. Frawley disclosed the allegations in the SAC to the government "as a freebie" and that their disclosures "set the wheels in motion for everything that followed regarding the investigation of the McMahons and their business dealings." [170, at 17, 21.] Thus, according to Relators, the disclosures were unsolicited by the government and made as "as a result of free will." [170, at 17.] However, Relators' emphasis on the government's original request for information regarding Rezko is misplaced. The government's original purpose in seeking Mr. Frawley's cooperation is irrelevant and does not change the fact that Relators only disclosed the information to further their own self-interests when Mr. Frawley was arrested for bank fraud. See *Paranich*, 396 F.3d at 341–42 (holding that information provided to the government was involuntary even though it was not in direct response to the government's subpoena because information was "produced as a result of the government's focus on relator and in an attempt to obtain a favorable outcome").

Finally, Relators argue that the government "made no concrete promises" to them in exchange for their disclosures and cooperation, and thus they did not receive any valuable consideration and acted voluntarily. This argument also fails, as the government rarely, if ever, makes specific promises in exchange for a defendant's cooperation. Despite the lack of a specific representation by the government regarding the outcome of Relators' cooperation, Relators knew that they were disclosing information to the government to obtain leniency in Mr. Frawley's bank fraud case. Thus, they did not disclose the information "voluntarily." See *Rosenberg*, 2016 WL 4203835 at *15 (holding that relator did not disclose information "voluntarily" when disclosures were made in response to the government's investigation of

relator, even though relator purportedly did not condition his participation in the government interview on the receipt of any legal protections).

This conclusion is supported by the fact that Mr. Frawley relied on Relators' cooperation in his sentencing memorandum and at sentencing.  Mr. Frawley's sentencing memorandum contends that he "help[ed] the government uncover material evidence in several significant public corruption investigations" and that his sister, Ms. Frawley, "proactively cooperated with the government on other ongoing investigations."  [146, Exhibit 1, at 13–14.]  At sentencing, Mr. Frawley's counsel stated that Mr. Frawley cooperated with the government "because he wanted to avoid [criminal prosecution]."  [146, Exhibit 2, at 21.]  Further, because of Relators' cooperation and the information they provided, the government recommended that Mr. Frawley receive a sentence of eighteen months, which was thirty-three months below the low end of his sentencing guidelines range.  [146, Exhibit 2, at 15.]  And the court sentenced Mr. Frawley to twelve months imprisonment, stating that "the most important aspect of this sentence is the substantial assistance the defendant has given the government in this case."  Thus, Relators acted in exchange for valuable consideration and did not disclose the allegations in the SAC to the government "voluntarily."  Relators do not meet the definition of "original source."

Because Relators' SAC is based on publicly disclosed information and Relators are not an original source of the information, Defendants' motion to dismiss for lack of jurisdiction under the public disclosure bar of § 3730(e)(4) is granted.  Allowing Relators to opportunistically benefit from information that they either previously disclosed to the FBI in exchange for leniency or learned from the FBI during that investigation and from news sources would not comport with the purpose of the *qui tam* provision of the FCA.

## B. Rule 9(b) Heightened Pleading Standard

Even if Relators' claims were not precluded by the public disclosure bar, the Court would grant Defendants' motion to dismiss most of the claims for failure to meet the heightened pleading standard of Rule 9(b). For most of the Defendants, the SAC fails to sufficiently plead with particularity a connection to federal funds.

As the Court explained in dismissing Relators' First Amended Complaint, § 3729(a)(1) of the pre-amendment FCA applies to conduct that allegedly occurred before May 20, 2009, the effective date of the Fraud Enforcement and Recovery Act ("FERA"), which amended the FCA. See *Frawley*, 2015 WL 115763, at *8. Before the 2009 amendment, the FCA imposed liability on a defendant who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

§ 3729(a) (2006). In contrast, § 3729(a)(1)(A) of the amended FCA applies to conduct that allegedly occurred on or after May 20, 2009. *Frawley*, 2015 WL 115763, at *8; Pub. L. No. 111–21, § 4(f), 123 Stat. 1617 (2009)). The amended FCA imposes liability on anyone who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of subparagraph (A), (B) * * *

§ 3729(a)(1). It expands the scope of a "claim" to include, in part:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that * * * is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government * * *

provides or has provided any portion of the money or property requested or
demanded * * *

§ 3729(b)(2) (internal statutory numbering omitted). Section 3729(a)(1)(B) of the amended FCA applies to all conduct alleged. *Frawley*, 2015 WL 115763, at *8; Pub. L. No. 111–21, § 4(f), 123 Stat. 1617 (2009)); see also *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639–40 (7th Cir. 2016).

### 1.    Alleged Connection with Federal Funds

The question before the Court is whether, under Rules 12(b)(6) and 9(b), Relators have adequately pled the connection with federal funds required by § 3729(a)(1) of the pre-amendment FCA, § 3729(a)(1)(A) of the amended FCA, and § 3729(a)(1)(B) of the amended FCA. Although under the amended FCA, Relators are not required to show that any false statement or claim was presented directly to the federal government, Relators are still required to sufficiently allege a nexus to federal funds. See *Garbe*, 824 F.3d at 639. The SAC alleges that Defendants submitted false claims concerning contracts with the City and municipal entities. The SAC attempts to connect Defendants' contracts to federal funds in several ways, most of which are unsuccessful.

First, Relators allege that because Defendants Ace Mechanical Co. and Windy City Electric Co. filled out sections of bid application titled "Certification of Federally Funded Matters," Defendants were awarded contracts funded by the federal government. [92, at ¶¶ 152–54.] However, Relators fail to provide any detail as to the nature of the federal subsidies. Relators draw a connection to federal funds that is too factually sparse and attenuated to survive the heightened pleading standard of Rule 9(b). Next, Relators allege that the Cook County Jail receives limited federal funds to reimburse the county for the cost of holding immigration detainees. [92, at ¶ 157.] However, this fails the heightened pleading standard because Relators

do not expressly allege that the Cook County Jail paid Defendants using federal funds. Additionally, Relators allege that Defendant Quantum Crossings was awarded four federally funded contracts as evidenced by a Freedom of Information Act response from the Chicago Department of Aviation. [92, at ¶ 159.] However, Relators do not allege that Defendant Quantum Crossings submitted any false claims related to these four federally funded contracts or that these four contracts are even related to the pattern of fraud alleged in the SAC.

Relators further allege, on information and belief, that many of Defendants' contracts with the Board of Education were at least partially funded by the federal government. [92, at ¶ 179.] As the Court held in dismissing Relators' First Amended Complaint, this allegation is insufficient under Rule 9(b) because Relators fail to provide any detail as to the nature of the federal subsidies and because Relators pled on information and belief without arguing that they lack access to further information about the contracts at issue and without pleading the grounds for their suspicions. See *Frawley*, 2015 WL 115763, at *9; *Pirelli*, 631 F.3d at 443 (A plaintiff may plead fraud based on information and belief "so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." (citations and internal quotation marks omitted)). Next, Relators allege that the Chicago Housing Authority receives funds from the federal government to redevelop and modernize public housing units. [92, at ¶ 182.] As the Court held in dismissing Relators' First Amended Complaint, Relators fail to state a claim under Rule 9(b) because the SAC does not expressly allege that the Chicago Housing Authority paid Defendants using federal funds. *Id.*

Further, to the extent the above alleged connections to federal funds relate to conduct alleged to have occurred before May 20, 2009, these claims fail under § 3729(a)(1) of the pre-amendment FCA because Relators do not make an allegation of presentment "to an officer or

employee of the United States Government." See *Frawley*, 2015 WL 115763, at *9. Thus, even if it were not for the public disclosure bar, Relators' claims based on these tenuous connections to federal funds would be dismissed under Rules 12(b)(6) and 9(b).

Finally, Relators allege that the federal government heavily subsidized the Chicago Public Schools' breakfast and lunch program. [92, at ¶¶ 145–51.] Here, Relators have sufficiently pled with particularity a connection to federal funds. The SAC alleges that Chicago Public Schools participate in the Federal Meal Reimbursement for School Lunch Program, also known as the National School Lunch Program. The CPS 2009 Budget Book discusses this program, explaining that "CPS offers breakfasts, lunches and dinners for children who participate in the program during the school year. The federal government provides free, reduced-price, and paid lunches and breakfasts under the National School Lunch Program. * * * [F]ederal revenues are projected to total $138.3 million in FY2009, which includes $134.2 million from breakfast and lunch programs * * *." [92, Exhibit 5.] This lunchroom fund was denominated as "Fund 312." [92, Exhibit 5.] The SAC also alleges Defendant C&M contracted with the Chicago Board of Education to deliver milk for the CPS lunch program and that Fund 312 is identified as the "Source of Funds" in these contracts. [92, Exhibit 7.] Further, the SAC alleges that in 2013, Defendant Aramark took over both the food and milk businesses for CPS, and the contract between Defendant Aramark and the Board of Education also indicates federal funding from Fund 312. Here, Relators have adequately pled that Defendants C&M and Aramark received federal funds through their CPS contracts with the Board of Education and that Defendants received these contracts because of their false certifications. Thus, if the SAC was not precluded by the public disclosure bar, only claims related to Defendants C&M and Aramark's federally-funded CPS contracts would have a chance at surviving Defendants' motion

to dismiss under Rules 12(b)(6) and 9(b).

### C. State Law Claims

The SAC alleges that the Court has supplemental jurisdiction over Relators' state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367. Under § 3732(b), a district court has jurisdiction over state actions arising from the same transaction or occurrence as an FCA action brought under § 3730. However, if the court has dismissed all claims over which it has original jurisdiction, the court has discretion to decline to exercise supplemental jurisdiction. § 1367(c)(3); see also *Miller v. Herman*, 600 F.3d 726, 73 (7th Cir. 2010) (noting that the decision to exercise supplemental jurisdiction is "squarely within [the district court's] discretion). The general rule is that when all federal claims are dismissed, the district court should decline to exercise supplemental jurisdiction over the state law claims. *Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)). Exceptions to this general rule exist

> (1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* (citation and internal quotation marks omitted).

Here, the SAC alleges state law violations continuing to the present, so Relators are not precluded from filing their suit in state court. Additionally, this case is only at the motion to dismiss stage, so requiring the state claims to proceed in state court, see 735 ILCS 5/13-217, will not cause a substantial duplication of effort. Finally, the outcome of the Illinois claims remains uncertain. Thus, the Court declines to exercise supplemental jurisdiction over the state claims brought under Illinois law.

**IV.    Conclusion**

For the reasons set forth above, Defendants' motions to dismiss [142] is granted pursuant to Rule 12(b)(1), and the case is dismissed as to all Defendants pursuant to Rule 12(h)(3). Defendants Aramark Correctional Services, LLC and Aramark Corporation's motion to dismiss [145] and Defendant Ampere Electric Co.'s motion to dismiss [153] are denied as moot. The Court declines to exercise supplemental jurisdiction over the state claims brought under Illinois law. Relators' Second Amended complaint [92] is dismissed in its entirety, and the Court will enter a final judgment and close the case.

Dated:  September 28, 2016

_____
Robert M. Dow, Jr.
United States District Judge